FILED

2011 Jul-15  AM 08:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL R. HINDMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NUMBER:** |
| | ) | **1:10-cv-00110-KOB** |
| **ALLSTATE FINANCIAL SERVICES,** | ) | |
| **LLC, and MARLIN McCAULEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This diversity matter comes before the court on "Defendants' Motion for Summary Judgment and Brief in Support" (doc. 31). Defendants argue that no genuine issues of material fact exist on Plaintiffs' remaining claims of breach of contract, fraud, negligence, and intentional interference with business relations, and that Defendants are entitled to a judgment in their favor as a matter of law. For the reasons stated below, the court finds the motion for summary judgment is due to be granted as to all remaining claims.

## PROCEDURAL HISTORY

This motion represents the third dispositive motion that Defendants have filed in this case. In January of 2010, they filed a motion to dismiss Counts 2-8 and a motion for definite statement regarding Count 1 (doc. 4). The court granted the motion for more definite statement as to Count 1. The court granted in part and denied in part the motion to dismiss Counts 2-8, and allowed the Plaintiff to amend his Complaint (doc. 15).

1

On July 16, 2010, the Plaintiff amended his Complaint and then filed a "Substitute Amended Complaint."  (Doc. 20).  That document contained six counts: Count One asserting Breach of Contract against Allstate; Count Two asserting fraud against Allstate based on its alleged representation that it had a need for an EFS agent in Alabama; Count Three  alleging that Allstate negligently failed to properly train agent McCauley; Count Four alleging that Allstate committed negligence in prematurely submitting the U-4 transfer form; Count Five alleging that Allstate intentionally interfered with the business relationship between Plaintiff and his previous employer, Wachovia; and Count Six asserting fraud against McCauley based on his alleged representation that Allstate had a need for an EFS agent in Alabama and based on alleged promissory fraud.

On August 13, 2010, the Defendant filed a second motion to dismiss, requesting that this court dismiss with prejudice Counts One, Three, and Six of the Substitute Amended Complaint. (Doc. 23).  The court denied the motion as to Count One, granted the motion as to Count Three, and granted it as to the promissory fraud claim in Count Six, dismissing with prejudice all claims in Count Three and the claim for promissory fraud in Count Six.  (Doc. 30).

After the rulings on those two motions, the claims that remain are the claims asserted in Count One (breach of an oral contract against Allstate); Count Two (fraud against Allstate based on the representation that Allstate had a need for an EFS in Alabama); Count Four (negligence against Allstate); Count Five (intentional interference with contractual relations against Allstate); Count Six (fraud against McCauley based on his representation that Allstate had a need for an EFS in Alabama).

On January 24, 2011, the Defendants filed the instant motion for summary judgment as to

2

all remaining claims.  (Doc. 31).  This matter has been fully briefed.

On July 5, 2011, the court held a conference in this case, and gave counsel an additional opportunity to point the court to: (1)  any *evidence* already in the summary judgment record the court may have overlooked supporting the falsity of McCauley's statement to Hindman that Allstate had a need for an EFS in Alabama; and (2) authority as to the effect of the December 14, 2007 contract, assuming *arguendo* Allstate had previously begun processing Hindman's U-4 form and other paperwork in violation of an oral contract to delay such processing.  Counsel submitted information as part of that invitation.

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Graham, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

## FACTS

The court views the following facts in the light most favorable to the Plaintiff. Thus, these are the facts for purposes of summary judgment only.

On April 7, 2005, the Plaintiff, Michael R. Hindman, began working for Wachovia as an at-will employee in the position of Financial Advisor. As a signing bonus for his accepting employment with Wachovia, Hindman was given a $25,000 forgivable loan; based on the terms of the loan, after the thirteenth month of Hindman's employment with Wachovia, Wachovia

began reducing the loan balance by approximately $1,000 per month and counting that amount as income for tax purposes.  The balance of the loan was set to be forgiven on April 10, 2008.

Defendant Marlin McCauley is a Financial Sales Consultant with Defendant Allstate Financial Services, Inc.,  and is responsible for the financial services production plan for the State of Alabama.  His responsibilities include recruiting, installing, and helping to establish people as Exclusive Financial Specialists (each known as an "EFS") in Alabama.   In November of 2007, McCauley began recruiting Hindman for the position of EFS with Allstate.  An EFS works with exclusive agents of Allstate, and serves a high number of households to earn the "EFS" designation.

Determining Allstate's need for an EFS involved the consideration of many factors. McCauley testified that to make that determination, he usually looks at the number of partnerships with exclusive agents, and the size of those partnerships "as far as items or households and so forth."  (Doc. 35-13, at 44).  According to Hindman, McCauley advised him that 3,000 - 5,000 Allstate households were needed to start up an EFS position. However, McCauley also testified that determining the need for an EFS was not based on a "finite rule," but was a "best guess estimate."  *Id.*  The Allstate team that made the determination of whether a need existed for an EFS position for Hindman included McCauley; McCauley's superior, Kevin Taylor; the Financial Sales Development Consultant, Hal Jung; and the Field Sales Leader, Danny Alldredge.  The team gave significant weight to exclusive agent Ricky Messer's request for a new EFS relationship, as well as the fact that agent Gay Blackwell did not have an EFS relationship at that time and had personally recommended Hindman.

After Hindman's first meeting with McCauley in early November of 2007, he met with

6

McCauley and also with Hal Jung, an Allstate development consultant, on other occasions in November or early December of 2007.  Bringing on a new EFS would positively impact McCauley's compensation if the EFS were successful and met certain financial benchmarks. During these preliminary meetings, McCauley and Hindman discussed that Hindman would work in Etowah and Calhoun Counties, if he decided to join Allstate. McCauley represented to Hindman that a pent-up demand existed, meaning business was ready to be written.  At one meeting, Hindman showed McCauley a pie chart reflecting that Hindman had $30 million to $50 million in book of business. McCauley was aware that Hindman wanted to work with an existing book of business, and represented to Hindman that the book of business at Allstate would be equal to or greater than his book of business at Wachovia. However, Hindman had sold only one insurance policy in the previous six years, and McCauley assured him that he would not need life insurance sales to meet his production requirements.

 One of the issues that McCauley and Jung discussed with Hindman during these meetings was the EFS education class that occurred on a regular basis in Chicago, Illinois.  To allay his fears about changing jobs and to give him an "opportunity [] to ask questions and have [his concerns] addressed," McCauley and Jung suggested during the second Allstate meeting with Hindman that Hindman audit that class.  (Doc. 32-14, at 178-79)  However, McCauley and Jung advised him that he would have to complete a paperwork package and submit it to Allstate to be accepted for that training.

Part of the paperwork package was a U-4 transfer form to the Financial Industry Regulatory Authority ("FINRA").  The executed form would transfer an individual's security sales licenses from one FINRA-Registered broker-dealer to another, and would notify the

previous broker dealer of the transfer.  Hindman was concerned about filling out any paperwork before he made the commitment to transfer to Allstate.  He indicated that the earliest he could possibly terminate his employment with Wachovia and begin working at Allstate was January of 2008.  He testified that he did not want additional taxable income in 2007 from Allstate bonus(es) upon transferring, and, before moving, he desired to receive his December 15, 2007 paycheck from Wachovia, to receive the December monthly amount of forgiveness for his Wachovia loan, and to use his accrued vacation time at Wachovia, which was unpaid.  Accordingly, he claims that he and McCauley agreed orally that the U-4 form would be held in check until Hindman made his final decision in January of 2008, and no paperwork would be exchanged between Allstate and Wachovia until Hindman's training was completed.  Similarly, McCauley testified that he and Hindman agreed that Hindman's U-4 would not be transferred until January of 2008, and that he was aware brokers cannot be dually registered. He knew that Hindman's registration with Allstate would result in Hindman's losing his registration with Wachovia.

McCauley notified Felicia Walker, who was an employee of  Allstate in Atlanta responsible for the "on-boarding" of new EFS candidates, that she needed to send Hindman a packet of paperwork.  On November 28, 2007, she sent Hindman the packet,  including a Form U-4 form used to transfer an individual's security sales licenses from one FINRA-Registered broker-dealer to another. The cover letter enclosing the paperwork informed Hindman that he "**MUST terminate with your current broker-dealer before attending the NSEC/Chicago Class.**" (Doc. 32-5).  The U-4 form contains a clause allowing any person, including current and prospective employers, to release any information that they have, "without limitation," to any

"jurisdiction, SRO, designated agency, employer, prospective employer, or any agent acting on its behalf." (Doc. 32-6, at 13, ¶ 8).

When Hindman received this paperwork, he then contacted Walker to ensure that his paperwork would not be processed, and he advised her that he had not yet decided to leave Wachovia. In his deposition, he testified about his conversation with Walker: "It was okay to have a file on me with this paperwork but not to process it any way, shape or form, do not contact Wachovia in any way, shape or form." (Doc. 32-14, at 48). According to Hindman, Walker assured him that Allstate personnel were professionals and that they would not process the paperwork. Walker disputes that this conversation occurred, but the court must accept Hindman's version at the summary judgment stage.

On or about November 28, 2007, Hindman signed the Pre-appointment Consent Form authorizing Allstate to verify his previous employment and authorizing Hindman's pre-appointment employers to release employment and character verifications to Allstate. Hindman submitted this form to Walker and did not submit anything in writing with it requesting that Allstate not contact Wachovia until after the first of the year.

In late November or early December, Allstate provided Hindman with other paperwork meant to facilitate his appointment as an EFS. As part of this paperwork, on or about November 28, 2007, Hindman signed the "Education Agreement for Allstate Exclusive Financial Specialist Program," which outlined the duties and obligations of Allstate Insurance Company and of Hindman regarding the Chicago EFS training class. However, the agreement does not contain a signature on behalf of Allstate. Paragraph VI.A. of the Education Agreement states:

This Agreement is the sole and entire agreement between the Company

9

> and Applicant, and it supersedes and replaces any prior employment,
> agency, or other agreement between the Company and Applicant.  This
> Agreement also supersedes any prior oral statements and
> representations by the Company to Applicant and any prior written
> statements and representations by the Company to Applicant in letters,
> manuals, booklets, memoranda, or any other format.

(Doc. 32-7, at 5, ¶ VI.A).  The Education Agreement also provided that all modifications must be

in writing and expressly state they are modifying the Education Agreement.  Further, the

Education Agreement set out terms upon which it  would terminate, including the applicant's

execution of a L2000 Allstate agreement.  Hindman acknowledges that none of these termination

events occurred prior to December 14, 2007, the last date of the training class.

 On or about December 3, 2007, Hindman executed and submitted his U-4 to Allstate.

He did not submit anything to Allstate in writing stating that Allstate should not process his U-4

form or should delay processing it.

Also on December 3, 2007, Hindman signed the Registered Representative Agreement,

which Allstate required him to execute to attend the EFS training class.  The Agreement also

includes a signature of D. Mark Olson on behalf of Allstate, but the date of Olson's signature is

not listed on the document.[1]  The Registered Representative Agreement includes the following

relevant provisions:

> This Agreement by Allstate Financial Services, LLC. . .and Michael R.
> Hindman . . .for the sale of registered products is effective on the date
> this Agreement is signed by Allstate Financial Services, LLC**.**
>
> **RELATIONSHIP**
> **g**.  You acknowledge and agree that *all customers solicited or serviced*
> *by you are customers of AFS,* and that we will own all rights to the

---

[1]Under the signature of D. Mark Olson on behalf of Allstate are the words "Date (For
AFS Use Only)."  Doc. 32-9, at 2.

business produced under this Agreement. . . . .

**DUTIES AND RESPONSIBILITIES**
You agree to:
**c.**  Adhere strictly to the rules of [FINRA[2]], the acts and regulations of the Securities and Exchange Commission ("SEC"), and all laws and regulations of the states and the United States relating to sales of registered products;
**e.**  *Obtain and maintain [FINRA] registration and state and federal securities and insurance licenses required for your activities as a registered representative of AFS*;

**PRIOR CONTRACT**
This Agreement is the sole and entire agreement between you and AFS, and it supersedes all other contracts or agreements between you and AFS.  This Agreement also *supersedes any prior oral statements* and representations by AFS to you and any prior written statements and representations by AFS to you in letters, manuals, booklets, memoranda, or any other format.

**GENERAL PROVISIONS**
**a.**  This Agreement may not be modified except by a written agreement between AFS and you which expressly states that it modifies this Agreement.  No other written statements, representations, or agreements and *no oral statements*, representations, or agreements *will be effective to modify this agreement.*

(Doc. 32-9) (emphasis supplied).  Hindman gave this signed document to McCauley before

attending the training session in Chicago and testified that he understood it would be held and not

processed.

When Walker received the paperwork packet Hindman submitted to her, she separated

the U-4 form and gave it to Robert Cooper, Allstate's regional coordinator, as she routinely did

with the U-4 forms she received.  Allstate procedures reflect that Cooper would next send the

---

[2] On or about July 30, 2007, NASD changed its name to the Financial Industry Regulatory Authority ("FINRA").  Thus, although some of  the relevant documents refer to "NASD," the court substitutes "FINRA" to avoid confusion.

paperwork to Allstate's registration unit in Nebraska, but Walker does not handle the processing of the U-4 form after she submits it to Cooper.  Walker maintained Hindman's paperwork needed for processing his agent number, and when she established an agent number on his behalf, Hindman was automatically registered for Chicago training.  Allstate sent Hindman a "welcome aboard" letter electronically from Chicago, giving him instructions about transportation and lodging for the Chicago EFS training class, and notifying him of Atlanta training that followed the Chicago class.

Plaintiff attended the Chicago EFS training class from December 10-14, 2007.  He was responsible for his own expenses for attending the Chicago class, but upon successful completion of the training class, he was eligible for an education bonus of $3,000 to defray those costs.

*After* Hindman attended the five days of training classes in Chicago and, while he was still employed by Wachovia, he also attended one day of a four-day Allstate training session in Atlanta, Georgia during December of 2007.  He never completed that session, because he was still working for Wachovia and did not want to take any more time off.

Sometime on or after December 14, 2007, Hindman printed his name by hand on the signature line of the L2000S Exclusive Financial Specialist Independent Contractor Agreement with Allstate with the date December 14, 2007.  The L2000S agreement contains the signature of an authorized representative for Allstate with the date of December 14, 2007.  Hindman disputes that he "executed" the L2000S agreement because he printed his name on the signature line instead of signing it.  In any case, he handed the document to Allstate personnel at the *Atlanta* training class, which occurred sometime after the completion of the Chicago training on December 14, 2007.  However, Hindman does not specifically recall to whom he gave the

document.  He did not attach to the L2000S anything in writing stating that Allstate should not process his U-4 form or other paperwork or should delay processing any paperwork.

The L2000S document provides in relevant part as follows:

> **I.     AUTHORITY**
> A. *Effective Dec. 14, 2007*, the Company appoints you as its agent to represent the Company in the Exclusive Financial Specialist Program ....You will not alter any contract or incur any expense or obligation for the company without prior written approval from the Company.
>
> B.  This Agreement is the sole and entire agency agreement between the Company and you, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and you.  *This Agreement also supersedes any prior oral statements* and representations by the Company to you. . .
>
> E.  You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company.
>
> G.  The parties acknowledge and agree that you are a *registered representative of Allstate Financial Services*, LLC ("AFS"), pursuant to a registered representative agreement between you and AFS, under which you are authorized to engage in the sale and servicing of *registered* products on behalf of AFS.
>
> **II.     DUTIES AND CONDITIONS**
> D.  You agree to maintain any required agent license in the state or states in which you are appointed to represent the Company and to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting your operation.
>
> **XX.     GENERAL PROVISIONS**
> A.  This Agreement may not be modified except by a written agreement between the Company and you which expressly states that it modifies this Agreement.  No other written statements, representations, or agreements and *no oral statements, representations, or agreements will be effective to modify this Agreement*.  No representative of the Company will have authority to modify this Agreement, except as provided in this Section XX.
> . . . .

B.  You acknowledge that you have reviewed the Supplement, EFS Agency Standards and EFS Manual and that you have an ongoing responsibility to review all changes to the Supplement, EFS Manual and EFS Agency Standards issued by the Company and agree to be bound by them.

D.  You acknowledge that you have read this Allstate L2000S Exclusive Financial Specialist Agreement, understand it, and agree to be bound by its terms and conditions.

(Doc. 32-10, at 2 & 10) (emphasis supplied).

On or about December 14, 2007, FINRA processed the U-4, and Allstate processed Hindman's paperwork.  Hindman became eligible to sell Allstate products on December 14, 2007, and Allstate mailed him a welcome letter dated December 14, 2007 congratulating him on having met the registration and licensing requirements to become a Registered Representative in Alabama.  The generation of this letter also notified Walker that she should generate a $5,000 Agency Establishment Bonus bonus to the representative.

On or about December 19 or 20, 2007, after Hindman returned from the Chicago training session (December 10-14) and the Atlanta training session (one day of training sometime *after* December 14), Hindman received a phone call from his superiors who informed him that Wachovia would be terminating him because that company had received his U-4 form transferring his license to Allstate.  His superiors advised him that an office manager would be outside of Hindman's office door in Gadsden to take his keys, and they instructed Hindman to send Wachovia a resignation notice and leave the premises immediately after handing over the keys. December 19 or 20, 2007 was the effective date of Hindman's resignation from Wachovia, and the  termination form states that the termination was voluntary.

McCauley also received notice that Hindman's paperwork had been processed and that he

14

was eligible to sell Allstate products.  Based on previous experience, he had not expected the processing to be completed before January of 2008, and considered this transfer in December of 2007 to be a mistake.  He understood that Hindman's being registered with Allstate would result in his losing registration with Wachovia.  Therefore, McCauley called Allstate personnel, asking why his paperwork processed so quickly, whether Hindman's former broker dealer had been notified, and whether Allstate could "unprocess" the paperwork.  (Doc. 35-13, at 24).  The person he contacted advised him that Allstate could not undo the processing.

At the time of Hindman's separation from Wachovia, a balance remained on the forgivable loan.  At some point after Hindman's separation from Wachovia, Wachovia threatened to collect the balance on that loan and sent Hindman at least one collection letter listing the unforgiven balance of his loan plus accrued interest as $4,476.43 and incorrectly listing his termination date as November 16, 2007. Hindman asserts that the correct amount of the loan balance upon his separation from Wachovia was $3,400. On January 20, 2008, Wachovia forgave the balance of the loan in full, including interest, despite the fact that Wachovia no longer employed Hindman.  The tax document reflecting the cancellation of the debt shows the balance forgiven as $4,166.60.  The record is unclear of the exact date that Hindman received notice of Wachovia's forgiveness of the loan balance.

Hindman began work as an Allstate EFS and received commissions in accordance with the terms of the L2000 and the relevant EFS commission schedules.  On or about December 20, 2007, Hindman received a $5,000 Agency Establishment Bonus from Allstate for meeting the requirements and accepting appointment as an EFS.  On December 24, 2007, Hindman received from Allstate a bonus of $3,000, which the company was obligated to pay him upon his

15

successful completion of the training class.

In the first couple of months after his appointment, Hindman worked with Allstate agent Gay Blackwell, who serviced between 1,000 and 1,500 Allstate households, and also worked with Ricky Messer, who serviced between 1,500 and 3,000 Allstate households.  By May of 2008, Hindman had increased his referral base and was working with four more Allstate agents.

In the summer of 2008, McCauley contacted Walker and advised her that Hindman was claiming he did not sign his contract.  Walker pulled Hindman's file, found Hindman's L2000S agreement and saw that Hindman had printed his name on the signature line.  Walker talked with Carla Lewallyn, Allstate's human resource service specialist, who said she would research the issue with the home office legal team to see if the company needed a cursive signature.  Allstate mailed Hindman a copy of the agreement backdated to December 14, 2007 and requested that he sign it in cursive.  McCauley informed Hindman that if he did not sign the agreement, Allstate could attempt to recover the commissions paid to Hindman in 2008.  Hindman did not return the agreement with a cursive signature.

Hindman terminated his relationship with Allstate in February of 2009.

## DISCUSSION

In its motion for summary judgment, Defendants assert that summary judgment is due to be granted on all remaining claims.  The court agrees and will address each count separately.

### A.  Count One: Breach of Contract against Allstate

In Count One, Hindman asserts that Allstate breached an oral contract to delay submitting the U-4 form, and, thus, avoid any communications with Wachovia about the transfer, until after the beginning of 2008.  To prevail on a claim of breach of contract, a plaintiff must demonstrate

16

"(1) the existence of a valid contract binding the parties in the action, (2) [his] own performance

of the contract, (3) the defendant's nonperformance, and (4) damages."   *Congress Life Ins. Co.*

*v. Barstow*, 799 So. 2d 931, 937 (Ala. 2001) (quoting *Employees' Benefit Ass'n v. Grissett*, 732

So. 2d 968, 975 (Ala. 1998)).

Allstate asserts that Hindman cannot meet the first element, because any alleged oral

agreement between Allstate and Hindman was not supported by consideration and, thus, it was

not a valid contract binding the parties.  Alternatively, it argues that if that oral agreement did

indeed represent a contract at some point, then merger clauses in the subsequent contracts

between the parties invalidated the prior oral contract.

 For the purposes of summary judgment, the court accepts that an oral agreement existed

between Hindman and McCauley that Allstate would delay submitting the U-4 form until

January of 2008 to allow Hindman to continue working for Wachovia throughout December.

The court finds that consideration existed for that oral contract, but the court agrees with

Defendants that Hindman's claim for breach of that oral contract nevertheless fails for the

reasons explained below.

The evidence reflects that *after* the alleged oral contract,  Hindman affixed his name to

three written Allstate documents: the November 28, 2007 Education Agreement; the December

3, 2007 Registered Representative Agreement; and the December 14, 2007 L2000S Exclusive

Financial Specialist Independent Contractor Agreement.  Each of these written documents

contained a clause stating that the contract was the "sole and entire agency agreement between

the Company and [Hindman]," expressly superseding any prior contracts and oral statements

between Allstate and Hindman.  Further, each of the written documents stated that it could not be

modified by oral statements but that modification had to be in a writing expressly stating that it modified the previous written contract.

Hindman questions whether Allstate and Hindman executed these three written documents and established legally binding contracts. He points out that the first document, the Education Agreement, does not contain a signature of an Allstate representative. Even if Hindman's argument challenging the effect of the Education Agreement is well-taken, and the court does not specifically find that it is, Hindman does not even attempt to argue that the December 3, 2007 "Registered Representative Agreement (for Allstate Exclusive Financial Specialist Independent Contractors)" was not properly executed, with signatures from both parties. However, because the Registered Representative Agreement purports to become effective as of the date it is signed by Allstate and because the date of the Allstate signature is unclear, the court cannot set a definite effective date.

Hindman further argues that he did not execute the third written agreement, the L2000S agreement, because his hand-printed name does not constitute his signature. The court rejects this argument. Under Alabama law, "[i]n the absence of a statute prescribing the method of affixing a signature, [a signature] may be affixed in many different ways. It may be written by hand, and, generally, in the absence of a statute otherwise providing, it *may be printed*, stamped, typewritten, engraved, photographed or cut from one instrument and attached to another." *Ex parte Barrows*, 892 So. 2d 914, 917-18 (Ala. 2004) (emphasis added). Hindman points the court to no Alabama statute requiring a cursive signature to effect the execution of a contract in these circumstances. He acknowledges hand-printing his name on the signature line and returning it to Allstate personnel. Accordingly, the court finds that his hand-printed name on the signature line

constitutes a signature under Alabama law.  It further finds that at least by December 14, 2007,

both sides had executed a document with a merger clause, which by its terms superseded any

prior oral contracts.

> When addressing merger clauses, the Alabama Supreme Court has explained:
>
>> As a general rule, "when parties reduce a contract to writing and intend that writing to be the complete contract, no extrinsic evidence of prior or contemporaneous agreements will be admissible to change, alter, or contradict the contractual writing."  *Sherman v. Woerner Magnolia Farms, Inc.*, 565 So. 2d 601, 605 (Ala. 1990). This is so, because, "all *prior or contemporaneous negotiations* are [deemed to be] merged" into that writing.  *Crimson Indus., Inc. v. Kirkland*, 736 So. 2d 597, 601 (Ala. 1999) (emphasis in original). "When a contract contains. . . a merger clause, the agreement is deemed to be 'integrated,' such that evidence of prior or contemporaneous agreements shall not be admitted to contradict the terms of the agreement."  *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1309 (11th Cir. 1998).  Merger clauses thus create a *presumption* that the writing represents an integrated, that is, the final and complete, agreement of the parties.

*Ex parte Palm Harbor Homes, Inc.*, 798 So. 2d 656, 660 (Ala. 2001) (emphasis in original).

Hindman argues, however, that even if he did hand-write his name on this written

contract with Allstate in December of 2007, the oral contract to delay submitting the U-4 and

delay contacting Wachovia was a *collateral agreement* that does not contradict the terms of the

agreement.  Indeed, merger clauses do not bar evidence of collateral agreements between the

parties.  *Ritter v. Grady Automotive Group, Inc.*, 973 So. 2d 1058, 1062 (Ala. 2007).

The Alabama Supreme Court has explained that to qualify as a collateral agreement, and,

thus, beyond the scope of a merger clause, an agreement must meet three requirements: "(1) The

agreement must in form be a collateral one; (2) it must not contradict express or implied

provisions of the written contract; (3) it must be one that parties would not ordinarily be expected

19

to embody in a writing."  *Id.* (quoting *Hartford Fire Ins. Co. v. Shapiro*, 117 So. 2d 348, 353

(Ala. 1960)).  In determining the first requirement, courts evaluate whether the parties intended

to form a collateral agreement by focusing on the "*conduct and language* of the parties and the

*surrounding* circumstances." *Id.*  (emphasis in original).  Courts also evaluate whether the written

agreement "dealt expressly with the subject matter of the alleged collateral oral agreement."

*Alabama Elec. Coop., Inc. v. Bailey's Constr. Co.*, 950 So. 2d 280, 289 (Ala. 2006).

The question whether a written contract is a complete integration of the parties'

agreement or whether collateral agreements to the written contract exist is a question of law for

the court.  *Moore v. Pennsylvania Castle Energy Corp.,* 89 F.3d 791, 797 (11th Cir. 1996) ("The

question whether the parties have assented to a writing as a complete integration of their

agreement is a question of law for the court. . . ." ).  The court must look to the subject matter of

the oral agreement, the language of the L2000S,  and the conduct of the parties and

circumstances surrounding the execution of the L2000S to determine whether the oral agreement

meets the three requirements of a collateral document.

Allstate argues that the oral agreement cannot represent a collateral agreement because it

contradicts the terms of the written L2000S agreement, and, thus, fails to meet the second

requirement of a collateral document.  Hindman denies that any contradiction exists between

L2000S and the oral agreement to delay the effect and processing of the written documents while

he continued to work for Wachovia in December 2007.  However, an examination of the L2000S

reveals several clear contradictions.

In addition to the merger clause in I.A. and I.B. of the L2000S agreement, stating that the

written agreement supersedes any prior oral agreement and all alterations must be in writing, the

L2000S specifically states that the contract and the relationship between Hindman and Allstate take effect as of December 14, 2007.  This provision directly contradicts the oral agreement that it would  *not* take effect until January 2008 or whenever the parties definitely decided to work together.  Thus, as of December 14, 2007, the writing evidences an intent to accept Allstate's offer and its conditions.

Further, provision I.G. provides that "[t]he parties acknowledge and agree that you are a registered representative of Allstate. . .pursuant to a registered representative agreement between you and [Allstate], under which you are authorized to engage in the sale and servicing of registered products on behalf of [Allstate]."  (Doc. 32-10, I.G., at 3).  This provision refers to the December 3, 2007 Representative Agreement that both parties re-affirmed by signing the L2000S.  As discussed previously, for Hindman to be *registered* as an Allstate representative, he must submit his U-4 form to transfer his sales license from his previous FINRA-registered broker, Wachovia, to Allstate. Thus, this provision also conflicts with the oral agreement to delay processing Hindman's U-4 form and other paperwork while he continued to work for Wachovia.

Therefore, these provisions in the L2000S contradict the earlier oral agreement that Allstate would delay processing Hindman's paperwork and that he would not begin working for Allstate until January 2008 or whenever the parties definitely decided to work together.  Because of that conflict, the court further finds that the oral agreement does not meet the requirements of a collateral agreement, that the L2000S agreement represents the contract  between the parties effective December 14, 2007, and that the L2000S's merger clause operates to supersede that oral agreement.  In short, the oral agreement was not in effect between the parties as of December 14, 2007 and afterwards; therefore, Hindman's claim for breach of that oral contract must fail.

To the extent, if any, that the oral contract was in existence before December 14, 2007, and that Allstate processed the U-4 form in alleged violation of the oral contract, the court finds that no damage occurred from that processing before the oral contract was superseded on December 14, 2007.  Rather, the evidence reflects that FINRA processed the U-4 form, that Hindman became eligible to sell Allstate products on December 14, 2007, and that Hindman was terminated after December 14, 2007.  Because no damage occurred *before* the oral contract was superseded, Hindman's *prima facie* case on the claim for breach of the oral contract must fail.

As an additional note, the court points out that Hindman's argument that no "mutual assent" existed as to the written contracts and that he only signed the written documents to get in the door of the Chicago EFS seminar would not apply to his execution and delivery of the *L2000S*.  He turned in the *L2000S* contract to Allstate personnel in Atlanta *after* the Chicago EFS seminar had concluded.  Hindman has submitted no evidence that he was required to sign the *L2000S* agreement as a condition to attending the Chicago or Atlanta training.  Indeed, he acknowledges in his brief that his "oral contract. . .was purely exploratory in nature, relating solely to the period pre-dating a decision to sign on as an [E]FS and to execute an L2000S." (Doc. 34, at 28).   Thus, Hindman appears to concede that the execution of the L2000S on December 14, 2007 with its merger clause superceded his oral contract.  Regardless of whether he means to make that concession, the L2000S did supercede the oral contract.

In sum, the court finds that the motion for summary judgment is due to be granted as to the breach of contract claim set forth in Count I.

## B.  Count Two: Fraud against Allstate and Count Six: Fraud against McCauley

In Counts Two and Six of his Substitute Amended Complaint, Hindman asserts that

22

McCauley's representation that Allstate had a need for an EFS in Alabama constitutes fraud.

To establish a claim for fraud under Alabama law, Hindman must prove the following elements: "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1160 (Ala. 2003). Allstate argues that Hindman's fraud claim fails because, among other reasons, he has failed to provide evidence of reasonable reliance.

In his brief, Hindman acknowledges that he "did not rely on [McCauley's representation] enough to accept the EFS position, but he did rely on [it] enough to continue to evaluate the position.  In fact, it was Plaintiff's desire to learn more about the position which led him to audit the EFS education class in the first place."  (Doc. 34, at 23).  This acknowledgment destroys the element of reasonable reliance.  Without that essential element, his fraud claim must fail. The court finds that the motion for summary judgment is due to be granted as to the claim of fraud asserted in Count Two.

As Allstate notes, Hindman raises what he characterizes as other fraudulent representations in the fraud section of his brief.  However, Counts Two and Six of the Substitute Amended Complaint assert only that Allstate represented that "it had a need for an EFS in Alabama.  In reliance on said promises and representations, Plaintiff accepted said Defendant's offer of employment and became an EFS for said Defendant."  Alabama law requires that fraud be pleaded with particularity.  Ala. R. Civ. P 9(b); *Henderson v. Washington Nat'l Ins. Co.*, 454 F.3d 1278, 1283-84 (11th Cir. 2006) (citing Ala. R. Civ. P. 9(b)).  Having failed to establish a *prima facie* case of fraud based on the theory of fraud asserted with particularity in Counts Two

and Six in his complaint, he may not now amend his complaint by asserting new theories of fraud in the argument section of his brief opposing summary judgment.

The court also finds, alternatively, that the fraud claim must fail because Hindman has not established that the representation of Allstate's need for an EFS was not simply a matter of opinion, or if that statement was a material existing fact, that it was false. *See, e.g., BellSouth Mobility, Inc. v. Cellulink Inc.,* 814 So. 2d 203, 217 (Ala. 2001) (holding that summary judgment was appropriate on statement of opinion involving representations regarding a defendant's commitment to its agents); *George v. Assoc. Doctors Health and Life Ins. Co.,* 675 So. 2d 860, 862 (Ala. 1996) (holding that summary judgment on fraud claim was appropriate when the alleged representation was not false).

Allstate presents evidence that no "finite science" existed to determine the need for an EFS, but that the Alabama personnel got together to make the decision based on numerous factors that they weighed.  All parties acknowledge that the number of households Allstate served in the relevant geographical area was an important consideration in determining the need for an EFS.  Even viewing the facts in the light most favorable to Hindman, which the court must do at this juncture, the only evidence quantifying the households needed to establish an EFS position sets that number at a range of 3,000-5,000 in the relevant area.  Further undisputed evidence reflects that Allstate did indeed serve that number of households in that area; Hindman acknowledged in deposition testimony that within a month of beginning work with Allstate, he was working with two agents that represented a range of households of approximately 4,500.

During a recent status conference with counsel, the court referred to the evidence indicating that Hindman served a number of households falling within the 3,000-5,000 range

shortly after coming on board with Allstate, and the court gave Hindman the opportunity to point out any evidence that it may have overlooked contradicting that number.  Hindman's subsequent submission did not point out evidence contradicting the fact that by January 2008 Hindman was working with two agents that represented approximately 4,500 Allstate households.  Thus, to the extent that the need for an EFS was based on the number of households served, Hindman has not presented *evidence* that the need did not exist and that the representation was untrue.

The post-conference submission did point out McCauley's other alleged false representations, which Hindman did not plead with particularity in his Substitute Amended Complaint but which Hindman now claims should frame the discussion of  whether a need existed, as referenced above.  Put another way, Hindman is attempting to stack representations, taking the one alleged false representation he did plead with particularity and supporting it with other alleged false representations he did not plead with particularity.   In light of Rule 9(b)'s requirements, the court disagrees that merely pointing to Hindman's own testimony about those additional *unpled* representations can form a proper foundation for fraud.

 Therefore, the court finds that the motion for summary judgment is due to be granted as to the fraud claims asserted in Counts Two and Six of the Substitute Amended Complaint.

## C.  Count Four: Negligence against Allstate

In Count Four of his Substitute Amended Complaint, Hindman argues that Allstate had a "duty to exercise care commensurate with the foreseeable risk that premature submission of the form U-4 transfer could damage Plaintiff's finances and career," and that it breached that duty. (Doc. 20, at 12).

Under Alabama law, the elements that a plaintiff must prove to establish negligence are

"(1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury." *DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 460 (Ala. 2008). That threshhold question, whether a duty exists, "'is a strictly legal question to be determined by the court.'" *Pritchett v. ICN Med. Alliance, Inc.*, 938 So. 2d 933, 937 (Ala. 2006) (quoting *Taylor v. Smith*, 892 So. 2d 887, 891-92 (Ala. 2004)).

Allstate argues that it owed no duty to Hindman to delay processing his paperwork. According to Hindman, the duty arises out his agreement with McCauley and Walker that Allstate would not process Hindman's paperwork, including the U-4 form, until January 2008 or until Hindman gave his assent. "Defendants accepted the duty to hold his paperwork, and failed to perform it." (Pl.'s Br., at 33). Allstate responds, however, that Alabama law does not recognize claims for negligence based on the alleged breach of contractual duties. Although Hindman cites a case stating the elements of a negligence cause of action, he cites no case in his brief stating that an alleged breach of a promise supports a negligence claim.

The court agrees with Allstate that its failure to perform on an alleged agreement does not necessarily give rise to a negligence action. The court notes that "a mere failure to perform a contractual obligation is not a tort. . . ." *C & C Prods., Inc. v. S. Central Bell Tel. Co.,* 275 So. 2d 124, 130 (1972), appeal after remand *sub nom. Premier Inc. Corp. v. Marlow*, 295 So. 2d 396, *cert. denied,* 419 U.S. 1033 (1974). However, the court has already determined that Hindman's breach of contract claim *cannot* proceed, and the point here is *not* that Hindman's tort claim cannot fly because he has an adequate remedy in contract. Rather, Alabama law focuses upon whether a duty exists in the first place, and provides that to establish a duty as a foundation for

tort liability, a plaintiff must show something *more* than a mere failure to do what he promised.

As the Alabama Supreme Court has explained:  "'There is, in Alabama, no tort liability for nonfeasance for failing to do what one has promised to do in the absence of a *duty to act apart from the promise made*.   On the other hand, misfeasance, or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things.'" *Pugh v. Butler Tele. Co., Inc*, 512 So. 2d 1317, 1320 (Ala. 1987) (quoting *Morgan v. S. Central Bell Tel. Co.*, 466 So. 2d 107, 114 (Ala. 1985) (emphasis added)).

Yet, in the instant case, Hindman simply argues what Alabama law does not recognize: that the duty arises merely from Allstate's failure to do what it promised - to delay processing paperwork.  In the section of  his brief addressing negligence, he asserts no theory of negligence based on duty *apart from the promise made*.

Hindman attempts in his recent post-conference submission to assert a new theory of negligence based on misfeasance or negligent affirmative conduct in the performance of a promise.  The court rejects that assertion as improper.  In any event, the court finds that Hindman has presented no evidence that Walker or Cooper, the Allstate personnel responsible for processing the U-4, *voluntarily began performing on the oral promise* and committed negligent affirmative acts during that performance.  *See Dailey v. City of Birmingham*, 378 So. 2d 728, 729 (Ala. 1979) (finding that where the city "voluntarily undertook to protect the public by erecting a fence along the bank of the ditch" even though it had no duty to do so, a jury question existed whether its failure to complete that construction was negligence; summary judgment was improper).  Without such evidence, the newly asserted theory of negligence would not apply.

In sum, the court finds that Hindman has not provided evidence of a duty, and thus, his negligence claim must fail as a matter of law.  The motion for summary judgment is due to be granted as to the claim for negligence.

**D.  Count Five - Intentional Interference with Contractual Relations against Allstate**

In Count Five, Hindman asserts that Allstate's submission of the employment verification form to Wachovia without his consent represents intentional interference with his contractual relations with Wachovia.  Under Alabama law, the elements of intentional interference are "(1) the existence of a contract or business relation; (2) defendant's knowledge of the existence of that relationship; (3) intentional interference in the relationship by the defendant; (4) an absence of justification for the interference; and (5) damage to the plaintiff as the result of defendant's interference."  *Chrysler Capital Corp. v. Lavender*, 934 F.2d 290, 294 (11th Cir. 1991).  "The tort of intentional interference with business relations was intended to provide a remedy for situations where a third party intentionally interferes with the relationship of two contracting parties, not as a remedy for situations where an allegedly breached contract between two parties. . .affects the relationship of one of the parties with a third party."  *Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So. 2d 1304, 1305 (Ala. 1990).

Allstate argues that the evidence does not support Hindman's specific allegation in the Substitute Amended Complaint: that the submission of the *employment verification form* interfered with Hindman's employment relationship with Wachovia.  To the extent that Count Five's allegations also cover the "interference" from the U-4 form's submission, however, Allstate also argues that the case of *Cahaba Seafood, Inc. v. Central Bank of the South,* 567 So. 2d 1304 (Ala. 1990) supports the dismissal of this claim.  In that case, a borrower claimed that a

bank intentionally interfered with the borrower's relationship with his clients when it breached

the contract by failing to finance the promised amount and by requiring the borrower's customers

to make weekly payments directly to the bank.  *Id.* at 1305-06.   In rejecting the intentional

interference claim as a matter of law, the Supreme Court of Alabama stated:

> The plaintiffs' intentional interference claim involves an alleged breach
> of contract on the part of Central Bank *that happened to affect* their
> relationship with the Wynfrey Hotel.  The tort of intentional interference
> with business relations was intended to provide a remedy for situations
> where a third party intentionally interferes with the relationship of two
> contracting parties, not as a remedy for situations where an allegedly
> breached contract between two parties . . . affects the relationship of one
> of the parties with a third party.  In the case *sub judice*, the plaintiffs filed
> an action for breach of contract, which would be a remedy for the alleged
> wrong committed by Central Bank.  If Central Bank is found to have
> breach that contract, then the money lost with regard to the Wynfrey
> account would be part of the potential damages to which the plaintiffs
> would be entitled.  Summary judgment was proper with regard to the
> claim of intentional interference with business relations.

*Id.* at 1306.

The instant case is quite different from that in *Cahaba Seafood,* in which the alleged

breach of contract just happened to affect the plaintiff's relationship with a third party.  Here, the

agreement between McCauley and Hindman about the delay in processing his paperwork,

including the U-4 form, was focused on the relationship between Hindman and Wachovia; *the*

*whole purpose of the delay was to ensure that no interference occurred*.  In other words, the

promise was not to interfere, so when Allstate reneged on its promise, interference was

inevitable.  The promise's focus on the relationship between Hindman and Wachovia provides

one important distinction between the instant matter and the facts of *Cahaba Seafood.*  In

addition, the court notes that the plaintiff in *Cahaba Seafood* still retained a breach of contract

claim post-summary judgment.  The Alabama Supreme Court recognized that the remedy for interference with the third party relationship that occurred as a result of any breach would be part of the potential damages in the breach of contract claim.  In the instant case, however, the court has determined that  because of the merger clause, the oral promise was not enforceable in contract, and Hindman cannot pursue a breach of contract claim.  Allstate cannot argue on one hand that no oral contract exists but yet assert, on the other hand, that the existence of a remedy under the contract precludes Hindman from bringing a separate tort claim.

Having found that *Cahaba Seafood* is distinguishable from the instant case, the court addresses the elements of Hindman's *prima facie* case on this claim.  The court finds that Hindman has provided evidence of the first element, the existence of a contract between Hindman and Wachovia.  He has also produced evidence that McCauley and Walker were aware of that contract, that both agreed with Hindman that the U-4 would not be processed until January 2008, and that Walker received Hindman's U-4 paperwork and sent it along the chain of command to Cooper for processing in December instead of holding it.  According to Hindman, he suffered damage as a result when Wachovia demanded his resignation.

The element of *intentional* interference is more problematic.  McCauley testified that the December processing was a mistake and that he made a call to see if the premature processing could be undone.  But, the evidence also reflects that McCauley had a financial motive to hurry up the process in 2007.  Based on this evidence, the jury could refuse to believe McCauley's testimony.  However, the evidence does not reflect that *McCauley* was involved in the processing of the U-4 form from the time Hindman signed it and submitted it to Allstate personnel in Atlanta.  So, Hindman's focus on *McCauley* is misplaced.

30

Walker, who works in the Atlanta office – not McCauley based in Alabama – received the U-4 from Hindman and forwarded it to Cooper for processing.  Hindman has not provided any evidence that Walker or Cooper would benefit from prematurely cutting short Hindman's employment with Wachovia. He has produced no evidence that Cooper ever knew of Hindman's desire to delay processing the U-4.  Rather, to support *intentional* interference, Hindman only proffers evidence that Hindman told Walker of his desire that she delay processing his U-4 form until January 2008 (or until he reached a definite decision on whether to form a relationship with Allstate), which evidence Walker disputes, but that Walker nevertheless forwarded the U-4 form to Cooper in December 2007.  Because Walker and Cooper would normally process all U-4 forms upon receipt, Hindman has not produced evidence that following the normal procedure resulted from anything other than mistake, forgetfulness, or ignorance of Hindman's desire to delay.

Therefore, the court finds that Hindman has failed to present evidence of intent and, thus, his *prima facie* case fails.   The motion is due to be granted as to the claim for intentional interference with business relations set forth in Count Five.

## CONCLUSION

In sum, the court finds that the motion for summary judgment is due to be granted as to all remaining counts, and judgment is due to be entered in favor of Defendants and against Plaintiff.  The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 15th day of July, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE